**GAIL CHIANG, JESSICA TUTEIN MOOLENAAR, LAMBERT JERRIES, HUBERT TURNBULL, and HECTOR RODRIGUEZ, Plaintiffs**

**v.**

**GOVERNOR CHARLES TURNBULL, IRA M. HOBSON, ANDREW RUTNIK, DEAN C. PLASKETT J. ARTHUR DOWNING, GEORGE CECILE PARROTT, PUBLIC FINANCE AUTHORITY, and SOUTHERN ENERGY, INC., Defendants**

Civil No. 74/2000

Territorial Court of the Virgin Islands,

Division of St. Croix

June 20, 2000

50

Lee J. Rohn, Esq., Christiansted, St. Croix, Virgin Islands, *for Plaintiffs*.

Kerry Drue, Esq. and Angela Tyson-Floyd, Esq., V.I. Department Of Justice, St. Thomas, Virgin Islands, *for Defendant Governor Turnbull*

51

TIMOTHY BROAS, ESQ., Winston & Strawn, N.W. Washington, D.C., *for Hobson, Rutnik, Plaskett, Downing and Parrott*

DEREK M. HODGE, ESQ., St. Thomas, Virgin Islands, *Co-Counsel For Hobson, Rutnik, Plaskett, Downing and Parrott*

MARIA TANKENSON HODGE, ESQ., Hodge & Francois, St. Thomas, Virgin Islands, Counsel *for Public Finance Authority.*

HENRY L. FEUERZEIG, ESQ., Dudley, Topper And Feuerzeig, St. Thomas, Virgin Islands, *for Southern Energy, Inc.*

ANDREWS, *Judge*

## MEMORANDUM OPINION

(Filed June 20, 2000)

## TABLE OF CONTENTS

INTRODUCTION

PROCEDURAL BACKGROUND

FACTS:

 1) The Parties

 2) RFP Issuance and PFA Funding

 3) The Agreements

LEGAL ANALYSIS:

 1) RFP Issuance, PFA Funding and Governor's Order

 2) Conflict of Interest

 3) Prior Legislative Authorization

 4) Prior Public Service Commission Authorization

 5) Equal Information Access

 6) Breach of Fiduciary Duty

CONCLUSION

**INTRODUCTION**

Since the Schneider administration, the Executive Branch of the Government of the Virgin Islands has considered privatizing the production and distribution of water and electric power. Negotiations have culminated in a Participation Agreement (the Agreement) between the Government and Southern Energy Virgin Islands, LLC, which is an affiliate of defendant Southern Energy, Inc. (Southern), a Georgia-based company. The Governor has submitted the Agreement, along with proposed enabling legislation, to the Legislature for ratification. Members of the community now seek judicial intervention to, among other things, require the Governor to withdraw the Agreement and proposed legislation from legislative consideration, to enjoin further government funding of expenses related to the privatization project, to declare certain contracts related to the project null and void, and to impose conditions on any future negotiations or agreements. They claim the Governor has employed illegal procedures to procure the Agreement by: 1) ordering the issuance of a Request For Proposals (RFP), on behalf of WAPA, to buy contractual services to study the feasibility of privatizing WAPA; and 2) ordering defendant Public Finance Authority (PFA) to pay for the feasibility study, expenses of a governmental task force and legal services associated with the privatization project. They further claim that the Governor and the Governing Board (the Board) of the Virgin Islands Water and Power Authority (WAPA): 1) accepted inappropriate gifts from Southern; 2) entered negotiations and agreements without obtaining prior authorization from the Legislature and the Public Service Commission; 3) failed to competitively bid the privatization project and 4) refused to provide the public and competitive bidders equal access to information. Defendants challenge the legal sufficiency and justiciability of these claims via motions to dismiss. Their motions raise the following key issues:

Whether Plaintiffs have alleged legally sufficient claims for relief based on:

1) illegal procurement of the Participation Agreement resulting [*4] from issuance of an RFP, and/or improper PFA funding of expenses related to the privatization project? (Count 1)

2) breach of fiduciary duty by the Board? (Count 6)

53

3) violation of the Conflict of Interest Statute due to acceptance of gifts by the Governor and Board? (Count 7)

4) violation of the WAPA Statute due to failure to obtain prior legislative authorization to negotiate the sale of control of WAPA's property? (Count 8)

5) violation of the Public Utility Statute due to failure to obtain prior authorization from the Public Service Commission to negotiate or agree to sell or transfer control of WAPA? (Count 9) or

6) violation of the competitive bidding, public disclosure, and restraint of trade laws due to refusal to disclose information concerning negotiations for the sale of WAPA? (Count 10)

For the reasons discussed below, this Court concludes that Plaintiffs' allegations, that the PFA's expenditure of funds and the Governor's order directing such expenditure were illegal, present legally sufficient claims for relief. All other allegations do not.

## PROCEDURAL BACKGROUND

Plaintiffs commenced this action for injunctive relief against Defendants and filed a motion for a temporary restraining order (TRO) on February 9, 2000. On two separate occasions they amended their complaint. On February 14th and 15th, Defendants filed motions to dismiss. This Court, on February 15th, held a hearing on Defendants' motions and stayed a hearing on the TRO motion.

On April 14, 2000, this Court granted the motions to dismiss as to Counts 2 - 5 only, and rescheduled the matter for hearing on Plaintiffs' motion for a TRO. Subsequently, Defendants filed new motions to dismiss the remaining counts. On May 8, 2000, this Court granted Defendants' motions to stay the hearing on the TRO motion. On May 17, 2000, this Court held a hearing on the motions to dismiss, granted Defendants ten days to file reply memoranda, and took the matter under advisement.

## FACTS[1]

### 1) The Parties

Plaintiffs are residents of the Virgin Islands. They pay income taxes and a rate for use of water and electricity in the Virgin Islands. Plaintiffs Lambert Jerries and Hubert Turnbull are current employees of the Virgin Islands Water and Power Authority (WAPA). Defendant Charles Turnbull (the Governor) is the duly-elected governor of the Virgin Islands whose term in office commenced in January 1999. Defendants Ira M. Hobson, Andrew Rutnik, Dean C. Plaskett, J. Arthur Downing and George Cecile Parrott are members of the Governing Board of WAPA (the Board). Defendant Southern Energy Inc. (Southern) is a utility company, organized under the laws of Georgia, that has done business in the Virgin Islands.

### 2) RFP Issuance and PFA Funding

On February 6, 1997, former Governor Roy L. Schneider caused a "Request for Proposal" (RFP) to be issued jointly by the Government and WAPA. They sought professional services from qualified firms to provide financial advice to the Government relative to the possible sale of an equity interest in WAPA. According to the RFP, the Government intended to sell or transfer an interest in WAPA to a private investor in exchange for cash or other consideration. Its plan was subject to a determination that the transaction was feasible and on the passage of

---

[1] The facts are derived from the allegations in the "Second Amended Complaint" filed in this matter on March 7, 2000. Strictly for purposes of the Motions to Dismiss, this Court takes as true the well-pled facts contained within the complaint. *Government Guar. Fund v. Hyatt Corp.,* 35 V.I. 356, 955 F. Supp. 441, 448 (V.I. 1997). Specifically, the Court draws facts from paragraphs 2 through 17, and 19 through 28. The other paragraphs are merely assertions or conclusions of law to which this Court is not bound. Id. Additionally, this Court considers and derives facts from undisputed documents relied upon by Plaintiffs and mentioned in their complaint, i.e., the Feb. 6, 1997 Request for Proposal (PP12, 48-49), the June 5, 1998 Assessment of Divestment Feasibility (PP13, 50-56), the July 23, 1999 Exclusive Due Diligence Agreement (PP16, 17, 63b), the October 7, 1999 Exclusive Negotiation Agreement (PP16, 17, 63b), the September 20, 1999 Term Sheet for Strategic Partnership along with the October 4, 1999 Letter by Richard F. Owen to Defendant Turnbull referenced in the Exclusive Negotiation Agreement, and the April 14, 2000 Participation Agreement plus proposed enabling legislation (PP25, 64-69). 955 F. Supp. at 449.

enabling legislation. The financial advice would assist the Government in determining WAPA's value and evaluating investor proposals. Additionally, the selected advisor would participate in presentations to any appropriate legislative or regulatory body and in the closing of the sale or transfer. The Government selected Price Waterhouse, a financial advisory firm, to perform the feasibility study.

Thereafter, the Government created an interdepartmental task force to negotiate the sale or lease of WAPA's assets. It hired the law firm of Winston & Strawn to perform legal work to facilitate the sale. Pursuant to Governor Schneider's directive, the Public Finance Authority funded the Price Waterhouse study, the task force expenses, and Winston & Strawn's legal services. Plaintiffs claim that the Government has spent, and will continue to spend, millions of dollars in costs related to the privatization project.

### 3) The Agreements

Prior to the commencement of Governor Turnbull's administration, former Governor Roy L. Schneider engaged in exclusive negotiations with Southern to purchase assets of WAPA. Governor Turnbull continued these negotiations. Neither governor obtained prior approval from the Legislature or the Public Service Commission to negotiate the sale, nor did they follow competitive bidding procedures. On July 23, 1999, the Board and Southern entered a 60-day "Exclusive Due Diligence Agreement." By this agreement, the Board granted Southern an exclusive right to perform due diligence studies and analyses regarding WAPA. Southern would then prepare a joint venture or partnership proposal for the transfer, sale, or other disposition of WAPA's assets or its management rights. The Board promised to negotiate with Southern to produce a "Term Sheet" which would describe Southern's offer. Two other utility companies inquired about purchasing WAPA's assets. According to Plaintiffs, the Governor and the Board failed to provide requested information or respond to the companies' inquires.

On October 7, 1999, the Government, through Governor Turnbull, and Southern entered into an "Exclusivity Agreement" in which the Government granted Southern an exclusive right to negotiate definitive agreements. These agreements were intended to form a partnership between Southern and the Government regarding WAPA. The

56

Exclusivity Agreement expired by its terms on December 31, 1999. Plaintiffs claim that Southern has improperly attempted to influence the Governor and the Board by providing them with first-class airfare, hotel accommodations, meals, and other benefits.

On April 14, 2000, the Governor signed a joint venture agreement between the Government and Southern dated February 11, 2000 and entitled "Participation Agreement (the Agreement)." Thereafter, he submitted the Agreement, along with proposed enabling legislation to the Legislature. Its contents have been publicly disclosed and is available via the Internet. Pursuant to the Agreement, the Government will establish a new 100% owned company named Virgin Islands Electricity and Water, LLC (VIEW). WAPA will transfer substantially all of its assets to VIEW, excluding its electric transmission and distribution assets, Government Accounts Receivables, and certain liabilities. The Government would sell 80% of its ownership interest in VIEW to Southern Energy Virgin Islands, LLC (SELLC), an affiliate of Southern, for $ 105,350,000.00. WAPA would continue to own, and then lease, its electric transmission and distribution assets to VIEW. VIEW would generate and distribute electric power and desalinate and distribute water within the Territory pursuant to an exclusive Franchise Agreement issued by the Government. The Government and SELLC would execute an Operating Agreement which would govern the affairs of VIEW and the conduct of its business. The Agreement becomes effective upon its ratification, passage of the enabling legislation, and performance by the Government of its obligations under the legislation. The Legislature has not scheduled a session date for ratification of the Agreement.

## LEGAL ANALYSIS

Defendants challenge the legal sufficiency and justiciability of Plaintiffs' complaint via motions to dismiss pursuant to Fed. R. Civ. P. R. 12(b)(6). In considering such motions, this Court is "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to [Plaintiffs]." *Jordan v. Fox, et. al.,* 20 F.3d 1250, 1261 (3d Cir. 1994). This Court may also consider undisputed documents relied upon by Plaintiffs though not attached to the complaint. *Government. Guar. Fund v. Hyatt Corp.,* 35 V.I. 356, 955 F. Supp. 441, 449 (D.V.I. 1997). In deciding motions to dismiss, the Court does not

57

decide whether Plaintiff will ultimately prevail. Instead the Court decides whether "relief can be granted under any set of facts that could be proved consistently with plaintiff's allegations." *Jordan,* 20 F.3d at 1261. In so doing, this Court notes that Plaintiffs have, in their memorandum, argued legal theories and facts not alleged in their complaint. Such arguments will not be addressed as they are not properly before the Court. With these principles in mind, the Court proceeds to separately address Defendants' bases for dismissal. Due to overlapping claims, Count 6 will be addressed last.

### 1) RFP Issuance/PFA Funding/Governor's Orders (Count 1)

Plaintiffs claim, in Count 1, that the negotiation process engaged in by Defendants was tainted by: A) the illegal issuance of an RFP; B) the illegal payments of consultants and expenses of a task force by the Public Finance Authority (PFA); C) orders of the Governor that conflicted with the WAPA statute; and D) orders of the Governor that violated the Revised Organic Act. Second Am. Compl., Count 1 PP48-53. Each item is separately addressed.

#### A) RFP Issuance

Plaintiffs assert that:

> The Commissioner of Property and Procurement did not have authority under 31 V.I.C. § 239(a)(4) to issue the RFP because it does not have the power to purchase contractual services for WAPA, an independent governmental instrumentality.

Second Am. Compl., Count 1 P48. Defendants respond that: 1) the RFP issuance was valid to the extent it was issued on behalf of the Government; and 2) the inclusion of WAPA's name on the RFP does not warrant nullification of the resulting contract. This Court agrees with Defendants.

The statute which governs the Commissioner's powers to purchase contractual services provides in pertinent part:

> The Commissioner of Property and Procurement shall—
>
> (1) purchase or contract for all supplies ... and contractual services ... required by any and all departments, offices, boards, institutions,

58

and other agencies of the Government of the United States Virgin Islands, except the Legislature and the Territorial Court;

31 V.I.C. § 232(1).[2] This provision does not include the power to buy supplies or services for autonomous instrumentalities like WAPA. *See* 30 V.I.C. §§ 103(a), 105(6) (creating WAPA as autonomous governmental instrumentality governed by a board, and granting it powers to enter contracts necessary or convenient in the exercise of its powers). It is thus apparent that the Commissioner is without power to issue RFPs for WAPA. The RFP at issue, however, was issued on behalf of the Government as well as WAPA. To this extent, its issuance was within the Commissioner's powers.

Further, a cursory review of the RFP reveals that the services sought were really to be provided to the Government, which would make all key decisions. Pursuant to the RFP, the Government:

1) intended to sell or otherwise transfer an interest in WAPA;

2) sought the services of a financial advisory firm;

3) would evaluate the proposals and make decisions regarding responses to the RFP;

4) reserved the right to award a contract or reject offers; and

5) retained the option to extend the contract with the selected advisor.

Pls.' 02/23/00 Opp'n. to Defs.' Mot. to Dismiss, Ex. 3 (RFP at 2,5,7,9). The mere inclusion of WAPA's name as a co-solicitor of proposals is harmless in light of the RFP's clear language revealing the Government as the sole solicitor. Such inclusion alone does not taint the negotiation process nor any resulting contracts. Plaintiffs do not allege that WAPA was a party to any resulting contract, that a respondent was misled by the inclusion of WAPA's name, or that a potential respondent was deterred by such inclusion. Thus Count 1 does not state a claim for relief with respect to the issuance of the RFP.

---

[2] Although the RFP in question recites that it was issued pursuant to 31 V.I.C. § 239(a)(4), such section merely provides an exception to the competitive bidding requirements of sections 235 and 236. The general powers of the Commissioner to buy supplies and services is governed by section 232.

## B) PFA Funding

Plaintiffs next allege that:

> The PFA acted outside its authority which is provided by Chapter 15 of Title 29 §§ 916-929 by funding the Price Waterhouse study, the interdepartmental task force, and the services of Winston & Strawn because the project was not specifically approved and authorized by the Legislature.

Second Am. Compl., Count 1 P50. Defendants argue that the PFA Statute, Legislative Act No. 6333, and the Organic Act authorizes the PFA payments. They also argue that dismissal is warranted due to Plaintiffs' failure to join indispensable parties. This Court finds no merit in Defendants' arguments.

■ The pertinent provision of the PFA Statute says:

> *Notwithstanding any provision of this chapter to the contrary,* the Authority shall be authorized to finance, to make loans for or otherwise to apply its funds only to those projects specifically approved and authorized by the Legislature of the United States Virgin Islands or otherwise authorized by law to be financed by the Authority, the Government of the Virgin Islands or any agency, instrumentality, commission, authority or political subdivision of the United States Virgin Islands.

29 V.I.C. § 920 (emphasis supplied). In light of this restriction on PFA's power to expend funds, Plaintiffs' allegation that the PFA expended funds for expenses related to an unapproved or unauthorized project clearly states a claim upon which relief can be granted. Plaintiffs further allege that funds have already been and will continue to be expended to pay consultants. *See* Second Am. Compl., P18. Thus to the extent Plaintiffs seek to enjoin future. PFA expenditures, without legislative authorization, their claim is not moot. This is so despite the Proposed Legislation which authorizes the Governor to execute all instruments to effectuate its intent, "including the payment of all of the Government's related transaction costs." Southern's Mot. to Dismiss, Ex. 2 (Proposed Legislation SECTION 108). It is questionable whether this proposed legislation authorizes past expenditures. Even if it does, its passage is an indeterminable future event. Thus, for the moment, Plaintiffs' claim is viable.

Defendants nevertheless contend that the expenditures were authorized by law. First, they assert that 29 V.I.C. § 919 authorizes the PFA to employ professional assistants such as Price Waterhouse and Winston & Strawn to review and evaluate proposed capital projects. They then contend that the PFA's expenditures were not to "finance or fund a project," but to review and evaluate the essential public projects mentioned in section 109 of the Proposed Legislation, along with a related determination of whether to privatize WAPA. Therefore, they conclude that section 919, and not 920, is controlling. The facts here belie Defendants' contention.

The Government's search for a financial advisor had nothing to do with the *non-mandatory* capital improvements listed in section 109.[3] No mention of those capital improvements appears in the RFP issued to potential advisors. The Government sought financial advice to assist it "in determining the value of WAPA and in soliciting and evaluating proposals from potential investors." Pls.' 02/23/00 Opp'n. to Defs.' Mot. to Dismiss, Ex. 3 (RFP at 2, 3) (revealing the entire scope of solicited services which all relate to the sale or transfer of an equity interest in WAPA). Clearly, "the project" at issue was, and still is, the privatization of WAPA. The employment of professional consultants and engagement of an interdepartmental task force was part and parcel of the project. Thus the PFA's payments constituted "financing or application of funds to the project." Consequently, section 920 is the controlling section. Pursuant thereto, legislative approval of the project, or some law authorizing its financing by the PFA or the Government, was a necessary prerequisite to the PFA's expenditures, even if Section 919 is contrary. *See* 29 V.I.C. § 920.

Second, Defendants contend that Act No. 6333 provides the necessary legislative approval required by 29 V.I.C. § 920. The Act provides:

---

[3] Although section 109 of the Proposed Legislation requires that the net proceeds from the sale of an 80% ownership interest in VIEW to Southern be deposited in a special account, it does not mandate that the funds be used for any particular purpose. It merely states that such funds "may be reinvested in capital improvements ... as set forth in paragraph (b) of this Section 109." *See* SECTION 109 of Proposed Legislation. Thus the funds may be applied to some, all, or none of the projects listed in section 109(b). In light of such a potential result, these projects could not have been the motivating factor in hiring the professional consultants.

SECTION 1. Within 90 days after the effective date of this Act, the Governor is authorized to submit plans to the Legislature for the privatization of government services, including the Virgin Islands Lottery, as he deems necessary and appropriate.

Act of Dec. 2, 1999, No. 6333 (23rd Legis.). A close reading of this Act reveals Defendants' misplaced reliance upon it.

Act No. 6333 does not specifically approve and authorize any project.[4] It neither defines nor describes a project. Its intent was to request that the Governor submit plans, which the Legislature would or would not approve. It merely seeks proposals on a general subject, i.e., the privatization of government services. Moreover, the Governor needs no Legislative approval or authorization to negotiate agreements and submit privatization plans, as part of proposed legislation, to the Legislature. Such power is explicitly granted by section 11 of the Revised Organic Act. *See* Revised Organic Act (1954), § 11 (stating "[Governor] may recommend bills to the legislature and give expression to his views on any matter before that body); *see also Kansas v. Finney,* 251 Kan. 559, 836 P.2d 1169, 1185 (Kan. 1992) (holding Governor had power to negotiate gaming compact despite state constitution prohibiting such gaming without authorization from the state legislature). Accordingly, Act No. 6333 does not satisfy the project funding prerequisites of 29 V.I.C. § 920.

Third, Defendants contend that sections 11 and 16 of the Revised Organic Act grant the Governor: 1) general supervision and control over instrumentalities such as WAPA; and 2) the power to examine the organization of the executive branch which includes WAPA. They argue that these grants of power include the derivative authority to hire professional consultants like Price Waterhouse and Winston & Strawn. Therefore, they conclude, the PFA's funding of the project was "authorized by law" as provided by 29 V.I.C. § 920. This argument is without merit.

■ Even if sections 11 and 16 of the Revised Organic Act authorized the Governor to engage professional consultants or reorganize

---

[4] Even if Act No. 6333 authorized the privatization project, such authorization was effective as of December 2, 1999 when the law was enacted. Plaintiffs allege that the PFA made expenditures since the issuance of the RFP on February 6, 1997. Thus they still allege a valid claim for relief relative to all pre-December 2, 1999 expenditures.

WAPA[5] they do not authorize the financing of the privatization project or, as Defendants contend, the reorganization project, by the PFA or any arm of the Government as required by 29 V.I.C. § 920. In short, they do not authorize the expenditure of government funds by the Governor. Such authorization is not implicit since: 1) reorganization may be accomplished without monetary expenditures or without the use of local government funds; and 2) the Organic Act places the purse strings of government finances in the hands of the Legislature. *See* Revised Organic Act (1954), § 3 (stating no money shall be paid out of V.I. treasury except in accordance with federal law or money bill of Legislature); and § 9(c) (requiring Governor to submit annual budget of estimated receipts and expenditures to serve as basis for ensuing year's appropriation bills by the Legislature). Accordingly, the Organic Act does not provide the requisite authorization to justify the challenged expenditures by PFA.

Lastly, Defendants assert that dismissal of Count 1 relative to the improper PFA funding claim is warranted for failure to join indispensable parties pursuant to Fed. R. Civ. P. 19. Plaintiffs concede that consultants Price Waterhouse and Winston & Strawn are indispensable parties. This Court concurs with Plaintiffs' concession. However, no evidence suggesting an inability to join the consultants has been presented. Accordingly, their non-joinder does not warrant dismissal. Instead this Court will order that they be joined.

### C) Governor's Orders in Conflict With WAPA Statute

Plaintiffs' third assertion in Count 1 is that:

> The Governor's orders also conflict with the WAPA statute that shows that the legislature gave WAPA exclusive authority over WAPA property and its disposition.

Second Am. Compl., Count 1 P52. Although not specified, this Court concludes that the orders referenced are those directing the issuance of an RFP regarding the sale of WAPA and the payment of consultants and related task force expenses by the PFA. *See* Second Am. Compl., PP49,

---

[5] Defendants' contention that WAPA is part of the Executive Branch and thus subject to reorganization by the Governor was intensely disputed. Resolution of this issue however is unnecessary in deciding the motions to dismiss.

63

51. Indeed, WAPA has been granted the power "to have complete control and supervision of facilities and properties constructed or acquired by it." 30 V.I.C. § 105(13). Further, no government agency or political subdivision of the Virgin Islands "shall have jurisdiction over [WAPA] in the management and control of its properties and facilities." 30 V.I.C. § 121. Plaintiffs do not allege any fact in support of their conclusion that the Governor's orders conflict with WAPA's exclusive authority over its property, and none is apparent. Despite the Governor's orders, it would appear that WAPA still has complete control and supervision over its properties. The Governor's mere studying of WAPA's organizational structure and submitting legislation to alter it, does not ipso facto alter or conflict with WAPA's complete control and supervision over its assets. Such action is only initiatory. It is only when, and if, the Legislature ratifies the Governor's plan that WAPA's control over its property would clearly be affected. This is permissible, however, for the Legislature, which created WAPA, may amend, alter, or modify the law to restructure WAPA at anytime, so long as the new law does not conflict with federal law. Revised Organic Act (1954) § 8(c); *see V.I. Press Assoc. v. Luis,* 1980 U.S. Dist. LEXIS 8916, 17 V.I. 329, 331 (D.V.I. 1980) (reasserting well-established principle that subsequent legislature may alter or amend acts of its predecessor, and agreeing that Legislature can amend WAPA's charter). This is so despite Plaintiffs' assertion that not even the Legislature can alter or abolish WAPA without its consent. Pls.' Opp'n. to Defs.' Mot. to Dismiss at 9, 27. Suffice to say, Plaintiffs' assertion is unsupported by law or logic. Accordingly, Count 1 fails to state a claim for relief relative to the Governor's orders conflicting with the WAPA Statute.

## D) Governor's Orders in Violation of Revised Organic Act

Plaintiffs also claim as follows:

> Thus, the Governor violated the Revised Organic Act by directing the Commissioner of Property and Procurement to issue an RFP Regarding the Sale of WAPA.

Thus, the Governor's orders directing the PFA to fund the Price Waterhouse study, finance the interdepartmental task force, and retain Winston & Strawn conflict with the PFA legislation and therefore violate the Revised Organic Act.

64

Section Am. Compl., Count 1 PP49, 51. Plaintiffs argue that the Governor has a duty, pursuant to section 11 of the Revised Organic Act, to faithfully execute the laws of the Virgin Islands. His orders, their argument continues, violated the Revised Organic Act, since they were contrary to the laws of the Virgin Islands, i.e., 31 V.I.C. §§ 232(1), 239(a)(4) and 29 V.I.C. § 920. Pls.' Opp'n. to Defs.' Mot. to Dismiss, at 27-29. This Court has already concluded that the Commissioner's issuance of the RFP on behalf of WAPA was harmless as it was properly issued on behalf of the Government as well. Thus the Governor's orders directing issuance of the RFP, similarly does not amount to a consequential violation of the Organic Act.

The Court also found that Plaintiffs have stated a valid claim for relief relative to the funding by PFA. Thus, it appears, as well, that a valid claim for violation of the Organic Act has been stated since the Governor's orders, being contrary to 29 V.I.C. § 920, would conflict with his duty to faithfully execute the laws. Revised Organic Act (1954), § 11. Such violations of the Public Utilities Statute and the Organic Act however, affect only the payments for the consultants and task force expenses. They do not taint the negotiation process nor the resulting Agreement. Further, such a violation does not justify Plaintiffs' request for withdrawal of the agreement from the Legislature. This Court can fathom no more blatant way to violate the Separation of Powers Doctrine. The violation of the Organic Act is thus relevant only to the extent Plaintiffs seek to enjoin further PFA spending without legislative approval.

### 2) Conflict of Interest (Count 7)

Plaintiffs allege in Count 7 that:

> Upon information the Governor, his government employee advisers and the WAPA Board members have been influenced by inappropriate gifts and benefits to enter into agreements with SEI, in violation of 3 V.I.C. § 1102.

> Second Am. Compl., Count 7 P65. Defendants respond that Plaintiffs have not sufficiently pled a statutory violation. This Court agrees.

65

The only potentially applicable provisions of the Conflict of Interest Statute are subsections 1102(1) and 1102(3) which provide that:

No territorial officer or employee shall:

(1) be financially interested in any contract made or negotiated by him in his official capacity, or by any public agency of which he is a member.

...

(3) have any interest, financial or otherwise, direct or indirect, or engaged [sic] in any business or transaction or professional activity, or incur any obligation of any nature, which is in substantial conflict with the proper discharge of his duties in the public interest and of his responsibilities as prescribed in the laws of the Virgin Islands.

3 V.I.C. § 1102(1), § 1102(3).[6] Although Count 7 alleges that the Governor and Board entered agreements (i.e., contracts), it fails to allege that they are financially interested in them, a necessary element of section 1102(1).[7] Therefore, Count 7 does not sufficiently state a claim for relief under section 1102(1).

---

[6] The other inapplicable subsections of section 1102 provide as follows:

No territorial officer or employee shall:

(2) be a purchaser at any sale or a vendor at any purchase made by him in his official capacity.

(4) accept other employment which will either impair his independence of judgment as to his official duties or require him, or induce him, to disclose confidential information acquired by him in the course of and by reason of his official duties.

(5) wilfully and knowingly disclose, for pecuniary gain to any other person, confidential information acquired by him in the course of and by reason of his official duties or use any information for purpose of pecuniary gain. 3 V.I.C. §§ 1102 (2)(4)(5).

[7] Pursuant to the Conflict of Interest Statute, financial interest includes:

(A) Entitlement to salary or other valuable remuneration as an officer of a business or corporation;

(B) Ownership of more than ten (10) percent of the shares of a corporation for profit, or an annual income from dividends, including the value of stock dividends and any other payments made by the corporation, in excess of $ 2,000.00 of the recipient's annual income;

██ Similarly, though it alleges the engagement in transactions, i.e., the receipt of gifts and benefits, Count 7 fails to allege that such transactions substantially conflict with official duties, a necessary element of section 1102(3). The mere allegation that the Governor, advisors and Board "entered agreements" does not assert a substantial conflict. A "substantial conflict" means that the officer or employee would derive direct monetary gain or suffer direct monetary loss, by reason of their official activity. 3 V.I.C. § 1103. Count 7 states nothing relative to the Governor, his advisors, or Board members deriving monetary gains or losses as a consequence of their alleged receipt of gifts and benefits.[8] Accordingly, Count 7 does not sufficiently allege a claim for relief.

### 3) Legislative Authorization (Count 8)

In Count 8, Plaintiffs state:

Prior to obtaining any authority from the legislature, the Governor and the Virgin Islands WAPA Board entered into negotiations and agreements with SEI that effectively involved sale of control of the property of WAPA, in violation of 30 V.I.C. § 105(7).

Second Am. Compl., Count 8 P67. Defendants maintain that no legislative authorization is required to negotiate, or agree, to sell WAPA's property, thus Plaintiffs fail to state a claim for relief. Defendants are correct.

---

(C) The right upon liquidation or dissolution to more than ten (10%) percent of the assets of a firm, partnership, or other noncorporate business entity, or an annual income to the recipient from a firm, partnership or other noncorporate business entity in excess of $ 2,000.00 of such recipient's income.

3 V.I.C. § 1101((1). Thus Plaintiffs' allegations that the Governor and Board received first class airfare, free hotel accommodations, and meals do not constitute a "financial interest" as contemplated by the statute. *See* Second Am. Compl., P21.

[8] Plaintiffs' allegation in paragraph 22, that Southern attempted to influence Plaintiff Hubert Turnbull by informing him that he would have first preference relative to a one-million dollar small business fund if his association supports the Agreement, does not save Count 7. Section 1102 prohibits acts by territorial officers and employees. Southern is neither, therefore its alleged conduct is not covered by the statute. Plaintiffs do not allege that Hubert Turnbull has any financial interest, much less that any such interest conflicts with his official duties, and thus fail to adequately state a claim for relief.

67

■ The statute allegedly violated provides that WAPA is granted all rights and powers necessary or desirable to carry out its purposes including:

> (7) to sell, lease, exchange, transfer, assign, mortgage, pledge, or otherwise dispose of, or encumber, any real or personal property, or any interest or estate in such; provided, that no provisions of law with respect to the acquisition, operation or disposition of property by other public agencies shall be applicable to the Authority unless the Legislature shall specifically so provide; and provided further, that except for a sale resulting from mortgage foreclosure, in no case shall the Authority have the power to sell any property unless the same, in the judgment of the Government Board, is no longer required for carrying out the business of the Authority or for effectuating the purposes of this chapter; provided, however, that the powers of this paragraph shall not apply where the Legislature has specifically exempted or restricted property from this paragraph;

30 V.I.C. § 105(7). This provision governs WAPA's powers over its real and personal property. It also permits the Legislature to specifically restrict those powers. Pursuant to the statute, WAPA may encumber any property not specifically exempted by the Legislature. It may also sell, exchange, transfer, or otherwise dispose of property, but only that which the Board determines is no longer required for WAPA's business and which the Legislature has not specifically exempted. Plaintiffs do not allege the improper *encumbrance* or *sale, exchange, transfer, or other disposition* of property. Instead, they allege that Defendants have *negotiated and agreed* to dispose of property. Absent actual disposition, however, there is no violation of section 105(7). The statute does not prohibit negotiations or agreements to dispose of property, much less require legislative authorization to do so.[9] Thus there is no legal impediment to the conduct alleged in Count 8.

---

[9] Even if section 105(7) prohibited negotiations and agreements to sell WAPA without legislative authorization, Count 8 still fails to state a claim. The only existing agreement to sell WAPA's assets is the Participation Agreement *to which WAPA is not a party*. Section 105(7) imposes no restrictions on the Governor, the contracting party in the Participation Agreement. Thus, Plaintiffs have not stated a claim for violation of 30 V.I.C. § 105(7). Further, as explained in Section 1B (PFA Funding) of this Opinion, the Governor does not need legislative authorization to

To the extent Plaintiffs assert that an illegal disposition of WAPA's property is afoot, Plaintiffs' claim is premature since no disposition can occur absent legislative ratification of the Participation Agreement. Since ratification is an indeterminable future event, Plaintiffs' claim is non-justiciable for lack of ripeness. Further, even if section 105(7) restricts implementation of the proposed sale or lease of WAPA's assets, section 103(a) of the enabling legislation, if passed, would exempt such restriction, thus precluding any violation of law. *See* Southern's Mot. to Dismiss, Ex. 1 (Proposed Legislation SECTION 103(a)). Accordingly, Count 8 fails to state a claim upon which relief can be granted.

### 4) Public Service Commission Authorization (Count 9)

Plaintiffs claim in Count 9 that:

> Prior to obtaining authority from the Public Service Commission for the sale or transfer of the control of WAPA, the Governor and WAPA Board have entered into negotiations and agreements for the sale of WAPA and the transfer of control of WAPA, in violation of 30 V.I.C. § 43a(a).

Second Am. Compl., Count 9 P69. Defendants contend that Plaintiffs fail to state a claim since PSC authorization is required only to actually sell, or transfer control of, public utilities. This Court concurs with Defendants.

The applicable statute provides:

> No person or corporation, whether or not organized under the laws of the Territory, shall sell, acquire or transfer control, either directly, or indirectly of any public utility organized and doing business in the Territory, without first securing authorization from the Commission. Any such acquisition or control without prior authorization shall be void and of no effect.

30 V.I.C. § 43a(a). Clearly, the statute prohibits the *sale, acquisition,* and *transfer* of control, of public utilities without PSC authorization. Count 9 does not allege the occurrence of any such sale, acquisition, or transfer. Instead, Plaintiffs allege that "the Governor *intends* that control of

---

negotiate and agree to sell WAPA pursuant to proposed legislation which the Legislature may accept or reject. Such power emanates from section 11 of the Revised Organic Act.

WAPA be passed to a new corporation ... without approval of the Public Service Commission."[10] Pls.' Opp'n. to Defs.' Mot. to Dismiss, at 38 (emphasis supplied). Section 43a(a) however, does not prohibit intentions, negotiations or agreements to sell, acquire, or transfer control of public utilities. Accordingly, Count 9 fails to state a claim upon which relief can be granted.

Furthermore, although the Governor has already submitted the Agreement to sell control of WAPA without PSC's approval, there is no intended or potential violation of section 43a(a). The intended acquisition by VIEW of WAPA, would be excepted from PSC authorization by implication since the enabling legislation authorizes such acquisition. Then, section 104(c) of the proposed enabling legislation specifically exempts the sale and assignment of Virgin Islands Electricity and Water's (VIEW's) 80% interest to Southern Energy Virgin Islands, LLC from the requirements of section 43a. Southern's Mot. to Dismiss, Ex. 2 (Proposed Legislation SECTION 104(c)). Thus the passage of enabling legislation would effectively amend section 43a and circumvent its violation should a sale occur. Plaintiffs claim, nevertheless, that the proposed legislation would constitute special legislation and violate the Equal Protection Clause. They now ask this Court to declare it invalid. As the legislation has yet to be passed and its full ramifications yet to be determined, such a request is premature. This Court will not render an advisory opinion on proposed legislation. Thus, to the extent that Plaintiffs now claim that the intended sale violates section 43a(a) because the proposed legislation is unconstitutional, such claim is non-justiciable for lack of ripeness. Accordingly, Count 9 does not state a potential claim for relief.

### 5) Equal Information Access (Count 10)

Count 10 of Plaintiffs' complaint reads:

> The Defendants affirmatively refused to provide equal access to information to competitive bidders and the public in violation of the laws concerning *competitive bidding, public disclosures,* and in *restraint of trade.*

---

[10] Plaintiffs also argue that the Governor's negotiating and agreeing to sell WAPA constitute a taking over of control of WAPA without PSC's approval. Such a conclusion is illogical and unsupported by any factual allegation in Plaintiffs' complaint. It thus does not make out a claim for relief.

70

Second Am. Compl., Count 10 P71 (emphasis supplied). Defendants respond that Plaintiffs have failed to sufficiently plead a violation of any applicable law. This Court concurs with Defendants and will separately address each category of law allegedly violated.

## A) Competitive Bidding Law

Plaintiffs contend that Defendants violated 30 V.I.C. § 116 (the Competitive Bidding Statute), by failing to competitively bid the entire project relative to privatizing WAPA. Pls.' Opp'n. to Defs.' Mots. to Dismiss, at 39-40. The statute however, does not require competitive bidding for any and every transaction or project involving WAPA. It requires competitive bidding only when WAPA is procuring supplies or services. In pertinent part, the statute provides:

> (A) All purchases and contracts for supplies for services, except for personal services, made by the Authority, including contracts for the construction of facilities of the Authority, shall be made after advertisement for bids sufficiently in advance of opening bids for the Authority to secure appropriate notice and opportunity for competition;

30 V.I.C. § 116(a). There are only three contracts relative to the "privatization project" to which section 116(a) could potentially apply and thus require competitive bidding, i.e., the Exclusive Due Diligence Agreement, the Exclusive Negotiation Agreement, and the Participation Agreement. None of them however, involve the procurement of supplies or services.

Pursuant to the Due Diligence Agreement, WAPA gave Southern the exclusive right to perform due diligence studies regarding WAPA. Southern intended to use the results to prepare a joint venture or partnership proposal for the transfer, sale or other disposition of WAPA's assets or its management rights. The Exclusive Negotiation Agreement gave Southern an exclusive right to negotiate an agreement to form a partnership with the Government regarding the transfer and lease of WAPA's assets. The Partnership Agreement involves, among other things, the establishment of a new company, i.e., VIEW, the transfer by WAPA of certain assets to VIEW, the sale of an eighty percent (80%) interest of VIEW to an affiliate of Southern, the lease of certain assets by WAPA to VIEW, and the operation of those assets by VIEW. The crux of the three contracts is the sale or transfer of WAPA's assets to a new company that will assume the role of producing and distributing water and electric power in the Virgin Islands. These are not contracts to procure

71

supplies or services for WAPA.[11] Thus section 116(a) is inapplicable. Accordingly, Count 10 does not state a claim for violation of the competitive bidding laws since competitive bidding was not required.

## B) Public Disclosure Law

 Plaintiffs allege that Defendants refused to provide information to the public in violation of the public disclosure law. They do not allege what information was refused to the public, what were the attendant circumstances, or what statute required its disclosure. Such bare allegations do not state a claim for relief. Further, Plaintiffs do not claim that the alleged refusal to provide information affected any agreement entered into by Defendants. The only existing Agreement, i.e., the Participation Agreement, is now before the Legislature. Thus Plaintiffs' claim is moot since the details of the Agreement have been publicly disclosed, and this Court is incompetent to withdraw the Agreement from legislative consideration.

## C) Restraint of Trade-Law

 Finally, Plaintiffs claim that Defendants' refusal to provide equal access to information violated the restraint of trade law. This Court presumes that Plaintiffs are asserting a violation of the Virgin Islands Antimonopoly law mentioned in the general allegations section of their complaint, and incorrectly cited as 30 V.I.C. § 1503(2) instead of 11 V.I.C. § 1503(2). Second Am. Compl., P43. Pursuant to section 1503(2), a violation of the Antimonopoly law occurs when a person "by contract, combination, or conspiracy with one or more other persons unreasonably

---

[11] Plaintiffs contend, nevertheless, that the Participation Agreement is a contract for the construction of facilities. Pls.' Opp'n. to Defs.' Mot. to Dismiss, at 39. Although the Agreement provides for the construction of facilities, it is not a contract as such. The Agreement merely requires VIEW to construct facilities. Whether VIEW would be required to bid the contract for such construction, and whether section 116(a) would apply to VIEW, are unripe issues not before this Court. Further, even if section 116(a) were applicable to the Participation Agreement, that agreement is not yet a contract for it does not take effect until certain events occur, including legislative ratification. Southern's Mot. to Dismiss, Ex. 1 (Participation Agreement at 4, 33). Such ratification, by implication, would effectively except any contrary local law, such as section 116(a). Accordingly, Plaintiffs have stated no claim relative to a violation of 30 V.I.C. § 116(a).

72

restrain trade or commerce." 11 V.I.C. § 1503(2). Plaintiffs have not alleged that Defendants contracted, combined, or conspired *for the purpose of restraining trade*. Consequently, the mere allegation that Defendants refused to provide equal access to information, without more, does not sufficiently state a claim under section 1503(2).[12]

### 6) Breach of Fiduciary Duty (Count 6)

Plaintiffs claim in Count 6 that:

Defendant Board has breached its fiduciary duty by

a. accepting gifts and other benefits from SEI, resulting in a conflict of interest, and tainting all further dealings with SEI

b. engaging in exclusive negotiations with SEI,

c. not following the competitive bidding procedures, and

d. agreeing to terms that are not in WAPA's or the ratepayer's best interests.

Second Am. Compl., Count 6 P63. Each item will be addressed separately.

First, as explained in Part "2" (Conflict of Interest) above, the mere allegation that Defendants accepted gifts and benefits, without any allegation concerning a financial interest, does not state a claim for conflict of interest. Consequently, Item "a" of Count 6 does not state a claim for breach of fiduciary duty based on conflict of interest.

Second, by opinion dated April 14, 2000, this Court dismissed Plaintiffs' claim relative to exclusive negotiations (i.e., Counts 2 - 5) as moot. Such claims are still moot as the exclusivity contracts have expired. Therefore, item "b" of Count 6 does not state a justiciable claim relative to breach of fiduciary duty due to Defendants' engaging in exclusive negotiations.

Third, as explained in Part "5A" (Equal Information Access) above, Defendants have not violated the competitive bidding law. Thus, Item

---

[12] Even if Count 10 stated a claim for violation of section 1503(2), such claim would be moot since competitive bidders and the general public now have equal access to information regarding the proposed sale of WAPA. Further, Plaintiffs have not alleged that the Agreement is now illegal (or how it might be so) as a result of Defendants' failure to provide equal access to information. Thus there is no effective relief this Court could render on such a claim.

73

"c" of Count 6 does not state a claim for breach of fiduciary duty due to failure to follow competitive bidding procedures.

 Lastly, Plaintiffs assert that the Board breached its fiduciary duty by agreeing to terms not in WAPA's or the ratepayer's best interests. Assuming arguendo that WAPA did agree to unfavorable terms, it is wholly without the province of this Court to decide, much less, say so. Such action would violate this Court's duty to pay due respect to coequal branches of government. What terms are, or are not, in WAPA's or the ratepayers' best interests are political questions which the Governor has answered, and which the Legislature is about to answer. Absent some violation of law, this Court will not second-guess or intrude upon the province of the executive or legislative branches by deciding such issues. *See Brown v. Hansen*, 27 V.I. 440, 973 F.2d 1118, 1121-22 (3d Cir. 1992) (explaining courts' refusal to resolve issues: a) that are primarily political, as opposed to legal; b) better suited for resolution by a coordinate branch; or c) whose judicial resolution would express disrespect due a coordinate branch). Here, no violation of law has been alleged. Accordingly, Item "d" of Count 6 does not state a claim for relief since it presents a nonjusticiable political issue.

## CONCLUSION

For the foregoing reasons, this Court concludes that: 1) Plaintiffs' allegation in Count 1 paragraph 50 that the Public Finance Authority violated 29 V.I.C. § 920 by funding expenses related to the privatization project without legislative approval of the project states a valid claim for relief; 2) Plaintiffs' allegation in Count 1 paragraph 52 that the Governor violated the Revised Organic Act by directing PFA to pay expenses related to the privatization project states a valid claim for relief; and 3) all other allegations in Count 1 and in the remaining counts do not present legally sufficient claims for relief. Further, the claims in Counts 8 through 10, even if they were legally sufficient have been mooted by the submission of the Participation Agreement along with enabling legislation to the Legislature and the disclosure of its contents to the public. This Court also concludes that Price Waterhouse and Winston & Strawn are indispensable parties whose joinder appears feasible. Accordingly, Defendants' Motions to Dismiss will be granted in part and denied in part via appropriate orders, and the Court will order the joinder of Price Waterhouse and Winston & Strawn as defendants.